E-filing

1  DONALD AMAMGBO
   AMAMGBO & ASSOCIATES
2  P. O BOX 13315, PMB # 148
   OAKLAND, CA 94661
3  510 615 6000/FAX: 510 615 6025

4  REGINALD TERRELL
   THE TERRELL LAW GROUP
5  P. O BOX 13315, PMB # 148
   OAKLAND, CA 94661
6  510 237 9700/FAX: 510 237 4616

7  SHARRON WILLIAMS GELOBTER
8  ATTORNEY AT LAW
   1736 FRANKLIN STREET, 10^(TH) FLOOR
9  OAKLAND, CA 94612
10 510 288 8686/FAX: 775-522-6586

11 Attorneys for Plaintiff
12

13

14            UNITED STATES DISTRICT COURT

15           NORTHERN DISTRICT OF CALIFORNIA

16
   SERGIO MARVILLA, individually and on behalf of
17 all others similar situated,                      No.

18              Plaintiff,                    CIVIL - CLASS ACTION

19     vs.                                    JURY TRIAL DEMANDED

20 UNITED   POTATO   GROWERS   OF
21 IDAHO,   INC.,   UNITED   POTATO
   GROWERS OF AMERICA, INC.; UNITED
22 II POTATO GROWERS OF IDAHO, INC.;
23 ALBERT WADA; WADA FARMS, INC.;
   WADA   FARMS   POTATOES,   INC.;
24 WADA-VAN ORDEN POTATOES, INC.;
25 WADA FARMS MARKETING GROUP,
   LLC; DOLE FRESH VEGETABLES, INC;
26 DOLE FOOD COMPANY, INC..; BLAINE
27 LARSEN FARMS, INC.; POTANDON
   PRODUCE LLC; GENERAL MILLS, INC.;
28

**FILED**

SEP - 2 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

ADR

**C10-03954**

-1-

1  MICHAEL CRANNEY d/b/a CRANNY
   FARMS; CORNELISON FARMS, INC.;
2  SNAKE RIVER PLAINS POTATOES,
   INC.; DRISCOLL POTATOES, INC.;
3  LANCE FUNK d/b/a LANCE FUNK
4  FARMS; RIGBY PRODUCE, INC.;
   PLEASANT VALLEY POTATO, INC.;
5  RAYBOULD BROTHERS FARMS LLC;
6  RD OFFUTT CO.; IDAHOAN FOODS,
7  LLC and BAYER CROPSCIENCE LLP,

8           Defendants.

9
                                              /
10                      **INTRODUCTION**

11      1.  Plaintiff Sergio Marvilla brings this action on behalf of himself

12  individually and on behalf of a plaintiff class (the "class") consisting of all persons

13  and entities in the State of California who indirectly purchased fresh and process

14  potatoes from Defendants and their co-conspirators from June 18, 2006 to the

15  present (the "class period").

16      2.  The Defendants include individual growers and national produce

17  companies; marketing and shipping agencies working as agents of an under the

18  control of individual grower and produce companies; and an Idaho potato

19  cooperative, this, in turn with other regional cooperatives, makes up the United

20  Potato Growers of America, Inc. ("UPGA"). UPGA is a national cooperative

21  through which Defendants have coordinated and facilitated their price-fixing

22  conspiracy.

23      3.  Plaintiff alleges that during the class period, Defendants and their

24  coconspirators used anticompetitive practices to fix, raise, maintain and/or stabilize

25  the prices at which fresh and process potatoes were sold in California by

26  controlling and reducing the aggregate supply of potatoes. Defendants entered into

27  an agreement to manage the supply of potatoes in the California for the purpose of

28

-2-

1    the elevating the sales prices of fresh and process potatoes. During the class

2    Period, Defendants coordinated their actions to implement a price- fixing and

3    supply management conspiracy. Among the actions Defendants took were (1)

4    agreeing to limit potato planting acreages; (2) agreeing to pay farmers to destroy

5    existing stocks or not to grow additional potatoes; and (3) agreeing to reduce the

6    overall number of potatoes available for sale to direct purchaser entities.

7    Additionally, Defendants implemented secondary market strategies designed to

8    limit the flow of potatoes to the market when prices were low so that those prices

9    could be increased.

10   4. Because of Defendant's anticompetitive behavior, Plaintiff and the

11   other class members paid artificially inflated prices for potatoes. Such

12   prices exceeded the amount that would have paid if the prices had been determined

13   by a competitive market.

## JURISDICTION AND VENUE

15   5. This Court has subject matter jurisdiction over this class action

16   pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332(d) (2),

17   because the matter in controversy, upon information and belief, exceeds

18   $5,000,000, exclusive of interests and costs, and this matter is a class action in

19   which class members are citizens of a different state than that of Defendant.

20   6. Venue is proper in this Court pursuant to 28 U.S.C. §1391 because the

21   misconduct at issue took place and had effects in this district. Further, Plaintiff

22   and numerous class members reside in this district and purchased potatoes and

23   potato products, and were thereby injured, in this venue.

24   7. This Court has personal jurisdiction over Defendants because Defendants

25   received substantial compensation and profits from sales of such products in this

26   district. Thus, Defendant's liability arose in part in this County.

27   ## PARTIES

28   **I. Plaintiff**

1   8.  Plaintiff Sergio Marvilla, a California resident, indirectly purchased
2   potatoes manufactured and/or distributed by one or more of the Defendants in the
3   State of California during the class period.

4   **II. Potato Cooperatives**

5   9.  Defendant UPGA is a non-profit corporation organized, existing, and
6   doing business under the laws of Utah with its offices and principal place of
7   business located in Salt Lake City, Utah. During the class period, UPGA
8   participated in and facilitated a supply- restriction and price fixing scheme.

9   10.  UPGA's members located throughout the United States produce
10  approximately 70 to 80% of the nation's fresh-market potatoes.

11  11.  UPGA's stated mission is to "manage national potato supply so as to
12  positively affect grower profitability." It achieves this goal primarily by limiting
13  potato-planting acreage among its members, including its ten member cooperatives.
14  UPGA also coordinates market calls among competitors so that the co-conspirators
15  can limit the flow of potatoes to the market when prices are low in order to further
16  increase prices.

17  12.  Defendant United Potato Growers of Idaho, Inc. (formerly known as
18  "United Fresh Potato Growers of Idaho" ("UPGI") is a corporation organized,
19  existing and doing business under the laws of Idaho with its offices and principal
20  place of business located in Idaho Falls, Idaho.

21  13.  UPGI is a founding cooperative member of UPGA.

22  14.  Defendant Albert Wada is an Idaho Grower who along with other
23  regional representatives in 2005 formed the nationwide cooperative, Defendant
24  UPGA.

25  15.  In 2009, after some members had left the group, UPGI announced it
26  would disband it if were unable to reach its membership goal of controlling 80% of
27  Idaho's fresh potato acreage. In late 2009, UPGI announced that its members had
28  reached 80% and the organization would continue.

-4-

1      16. Defendant United II Potato Growers of Idaho, Inc. ("United II") is a
2 corporation organized, existing and doing business under the laws of Idaho with its
3 offices and principal place of business located in Idaho Falls, Idaho. During the
4 class period, United II participated in the supply-restriction and price-fixing
5 scheme.

6      17. In 2007, UPGI formed United II, a second cooperative consisting of
7 UPGI members. United II created a joint venture with Defendant RD Offutt Co.
8 (the largest potato grower in the country) and Defendant Idahoan Foods. Idahoan
9 Foods is one of the largest potato dehydrates in the country, and the United II
10 grower-owners supply all the potatoes for its Idaho and Nevada plants.

11 **III. Potato Growers, Packers, Marketing Agencies and Licensors**

12      18. Defendant Wada Farms, Inc. is a corporation organized, existing and
13 doing business under the laws of Idaho with its offices and principal place of
14 business located in Blackfoot, Idaho.

15      19. Defendant Wada Farms Potatoes, Inc. is a corporation organized,
16 existing and doing business under the laws of Idaho with its offices and principal
17 place of business located in Blackfoot, Idaho.

18      20. Defendant Wada-Van Orden Potatoes, Inc. is a corporation organized,
19 existing and doing business under the laws of Idaho with its offices and principal
20 place of business located in Blackfoot, Idaho.

21      21. Wada Farms, Inc., Wada Farms Potatoes, Inc. and Wada-Van Orden
22 Potatoes, Inc. are collectively referred to as "Wada Farms."

23      22. Wada Farms operates an irrigated farming enterprise in southeastern
24 Idaho growing fresh and process potatoes, seed and commercial wheat, corn, alfalfa
25 , sugar beets and hybrid canola seed. Established in 1943, Wada Farms operates in
26 six diversified farming locations in three counties, totaling around 30,000 irrigated
27 acres. The Wada enterprise also includes a fresh potato, onion, sweet potato
28 marketing group, a 140,000-square-foot fresh potato packing warehouse and a

-5-

1  trucking company.

2  23. Growing over a billion potatoes annually, Wada Farms is among the
3  largest growers and packers in the industry.

4  24. In addition to numerous national co-packers, Wada Farms has potato co-
5  packing agreements with entities in California, Washington, Idaho, Colorado,
6  Nebraska, North Dakota, Wisconsin, Illinois, Minnesota, Kentucky, Alabama,
7  Georgia, New York, Pennsylvania, Maine, Missouri, Florida, North Carolina,
8  Pennsylvania, New Jersey and Massachusetts.

9  25. Defendant Albert Wada is the Chairman and former CEO of Wada
10  Farms. Albert Wada is domiciled and residing at 1385 W. Highway 39, Pingree,
11  Idaho 83262-1126.

12  26. Defendant Wada Farms Marketing Group, LLC ("Wada Farms
13  Marketing") is a limited liability company organized, existing and doing business
14  under the laws of Idaho with its offices and principal place of business located in
15  Pingree, Idaho.

16  27. Wada Farms Marketing acts as the agent of and handles the marketing
17  and sales for Wada Farms and Dole-label potatoes, onion and sweet potatoes.
18  Wada Farms Marketing has offices in Idaho, Oregon and Texas and distributes
19  potatoes throughout the United States.

20  28. Wada Farms Marketing holds the exclusive marketing for all potatoes,
21  onions and sweet potatoes sold under the national Dole label.

22  29. Defendant Dole Fresh Vegetables, Inc. ("Dole Fresh Vegetables") is a
23  corporation organized, existing and doing business under the laws of California
24  with offices and its principal place of business located in Monterey, California.
25  During the class period, Dole Fresh Vegetables participated in the supply
26  restriction and price-fixing scheme alleged.

27  30. Dole Fresh Vegetables is a division of Defendant Dole Food Company,
28  Inc.

-6-

1    31.  Dole Fresh Vegetables sources, harvests, distributes and markets over 35
2   varieties of fresh vegetables, including iceberg lettuce, celery, cauliflower, red
3   and green leaf lettuce, romaine lettuce, butter lettuce, spinach, spring mix, broccoli,
4   Brussels sprouts, green onions, asparagus, snow peas, radishes and artichokes.

5    32.  Dole Fresh Vegetables has exclusive licensing agreements for a line of
6   potatoes and onions with the Wada Defendants and with other producers for other
7   vegetables.

8    33. Dole Fresh Vegetables is a participant in various trade associations
9   frequented by potato marketers, growers or potato growing cooperatives, such as
10   the United Fresh Produce Association and the Produce Marketing Association.

11    34.  Dole Fresh Vegetables is an authorized out-of-state potato broker with
12   the Idaho Potato Commission.

13    35.  Defendant Dole Food Company, Inc. ("Dole Food") is a corporation
14   organized, existing, and doing business under the laws of Delaware with its
15   principal executive offices located in Westlake Village, California.

16    36.  Founded in Hawaii in 1851, Dole Food had 2007 revenues of $6.9
17   billion and is the world's largest producer and marketer of fresh fruit and
18   vegetables. Dole Fresh Vegetables and Dole Food are referred to collectively as
19   "Dole Defendants."

20    37. As the licensor of potatoes sold by the Wada Defendants, the Dole
21   Defendants had control over many aspects of the marketing, selling, packaging,
22   quality and branding of these potatoes. As the exclusive marketer of "Dole" brand
23   onions, potatoes and sweet potatoes, the Wada Defendants enjoyed frequent contact
24   with and supervision from Dole representatives.

25    38. Throughout the class period, the Dole Defendants exercised actual or
26   apparent authority over the Wada Defendants as those Wada entities publicly and
27   repeatedly announced their intentions to reduce potato supplies nationwide and
28   encouraged competitors to do the same. The Dole Defendants invested authority in

1 the Wada Defendants to act on Dole's behalf

2 39. Defendant Blaine Larsen Farms, Inc. ("Larsen Farms") is a corporation
3 organized, existing and doing business under the laws of Idaho with its offices and
4 principal place of business located in Hamer, Idaho.

5 40. Larsen Farms grows, packs and distributes potatoes under the Larsen
6 Farms brand and private labels. Larsen Farms operates farmland and facilities in
7 Idaho, Nebraska and Colorado and services retail and food-service customers
8 worldwide. The company also makes processed potato products (crushed, diced,
9 flaked and sliced), which it supplies to food processors.

10 41. Larsen Farms grows, stores, processes and transports its own potatoes
11 and refers to itself as a "vertically integrated potato grower."

12 42. Blaine Larsen of Larsen Farms was one of the founders of UPGI, a
13 UPGI Board Member, and an originator of the price-fixing scheme alleged.

14 43. Defendant Potandon Produce LLC ("Potandon") is a limited liability
15 company organized, existing and doing business under the laws of Idaho with its
16 offices and principal place of business located in Idaho Falls, Idaho.

17 44. Once a division of Pillsbury, Potandon is now an independent company
18 owned by five prior Pillsbury managers and six grower/shippers who control the
19 company's operations. With over 45,000 acres and six packing facilities in Idaho,
20 Potandon sells potatoes and onions to major retailers, club stores, wholesalers,
21 produce distributors and restaurant chains across the United States at the direction,
22 and on behalf of and/or as the agent of its grower/shippers.

23 45. In June 2002, Potandon merged the sales and marketing activities from
24 the Idaho Fresh Cooperative ("IFC") into its operations. IFC is a 70-grower
25 cooperative with over 25,000 acres of potatoes and six packing sheds located
26 throughout the Snake River Valley.

27 46. In June 2002, Potandon also merged the sales and marketing activities
28 for High Country Potato, located in Rexburg, Idaho.

C:\Documents and Settings Potato Antitrust Litigation

COMPLAINT

1     47.  Two Washington grower/shippers (Harvest Fresh Produce and Alcom &
2  Moe) merged with Potandon in June 2005. In January 2006, Potandon merged with
3  Murakami Produce, the largest supplier of onions in the Idaho and Oregon region.
4  In October 2006, Potandon merged the sales activities of Larsen Farms into
5  Potandon.

6     48.  Outside of Idaho, Potandon has established an extensive network of over
7  60 potato and onion co-packers in 24 states with another nine co-packers in
8  Canada.  In addition, Potandon is involved in multiple joint-venture growing areas
9  and has several exclusive sales agreements.

10     49.  By combining these sales and marketing functions of its growers,
11  Potandon has positioned itself as the largest marketer of potatoes in North America.
12  Potandon controls a 25% share of the Idaho potato market and a 12% share of the
13  total national potato market.

14     50.  Potandon owns the exclusive licensing rights to the Green Giant® brand
15  for fresh potatoes and onions pursuant to an agreement with Defendant General
16  Mills.  Potandon also markets Sun Spiced potatoes.

17     51.  Potandon sells potatoes throughout the United States and solicits internet
18  sales on its website at http://www.potandon.com/contact.htm.

19     52.  Defendant General Mills, Inc. ("General Mills") is a corporation
20  organized, existing and doing business under the laws of Delaware with its offices
21  and principal place of business located in Minneapolis, Minnesota.

22     53.  General Mills is an authorized out-of-state processor with the Idaho
23  Potato Commission.

24     54.  As the licensor of potatoes sold by the Potandon Defendants under the
25  trademark "Green Giant Fresh®," General Mills has and has had, through its
26  exclusive licensing agreement, control over many aspects of marketing, selling,
27  packaging, quality and branding of these potatoes. General Mills' involvement with
28  Potandon's operations includes specifying and designing packaging, designing and

-9-

1  managing cross promotions, headquarters sales calls, quality and safety standards
2  and inspecting potato growing and packaging operations.

3     55. As the exclusive licensor of the "Green Giant Fresh®" trademark,
4  Potandon enjoys frequent contact with and supervision from General Mills
5  representatives.

6     56. Throughout the class period, General Mills exercised actual or apparent
7  authority over Potandon and its growers as those entities publicly and repeatedly
8  announced their intentions to reduce potato supplies nationwide and encouraged
9  competitors to do the same.

10    57. Defendant Michael Cranney is an individual doing business as Cranney
11 Farms, an assumed business name under the laws of Idaho, located in Oakley,
12 Idaho. Michael Cranney is domiciled and residing at 503 W. 1300 S., Oakley,
13 Idaho 83346.

14    58. Cranney Farms grows process and fresh potatoes, sugar beets, corn,
15 wheat and barley.

16    59. Michael Cranney of Cranney Farms is a founding member of UPGI and
17 one of the original incorporators of UPGA. At a January 2008 UPGA meeting, Mr.
18 Cranney, UPGA Supply Management Committee Chairman, reminded grower
19 attendees of UPGA's instruction to reduce potato acreage in the coming year by
20 5% — and told the audience that UPGA would advise even non-members to do the
21 same.

22    60. Defendant Cornelison Farms, Inc. ("Cornelison Farms") is a
23 corporation organized, existing and doing business under the laws of Idaho, and its
24 principal place of business is located in Rexburg, Idaho.

25    61. Cornelison Farms grows, packages and ships fresh potatoes.

26    62. With Mr. Wada, Keith Cornelison of Cornelison Farms organized the
27 first meeting of growers in September 2004 of what would eventually become the
28 UPGI. Cornelison Farms is a founding member of UPGI and has long advocated

-10-

1   for collective action to reduce potato supplies.

2       63.  Defendant Snake River Plains Potatoes, Inc. ("Snake River Plains
3   Potatoes") is a corporation organized, existing and doing business under the laws of
4   Idaho, and its principal of business is located in Rexburg, Idaho.

5       64.  Snake River Plains Potatoes is a founding member of UPGI and a
6   UPGA member. David Beesley, chief executive officer of Snake River Plains
7   Potatoes, is a member of the UPGA executive committee.

8       65.  Defendant Driscoll Potatoes, Inc. ("Driscoll Potatoes") is a corporation
9   organized, existing and doing business under the laws of Idaho, and its principal
10  place of business is located in American Falls, Idaho.

11      66.  Driscoll Potatoes is an integrated potato producer that grows, packs,
12  stores and ships its own potatoes.

13      67.  Driscoll Potatoes is a founding member of UPGI, and Loraine Driscoll
14  of Driscoll Potatoes is an original incorporator of UPGA. Loraine Driscoll has
15  served on the UPGA Board of Directors.

16      68.  Defendant Lance Funk is an individual doing business as Lance Funk
17  Farms, an assumed business name under the laws of Idaho, located in American
18  Falls, Idaho. Lance Funk is domiciled and residing at 3853 Rast Rd., American
19  Falls, Idaho 83211.

20      69.  Lance Funk is a potato grower.

21      70.  Lank Funk Farms is a founding member of UPGI.

22      71.  Defendant Rigby Produce, Inc. ("Rigby Produce") is a corporation
23  organized, existing and doing business under the laws of Idaho and is located in
24  Rigby, Idaho.

25      72.  Rigby Produce is an integrated potato producer that grows, packs, stores
26  and ships its own potatoes.

27      73.  Rigby Produce is a founding member of UPGI.

28      74.  Defendant Pleasant Valley Potato, Inc. ("Pleasant Valley Potato") is a

-11-

C:\Documents and Settings Potato Antitrust Litigation
COMPLAINT

1 | corporation organized, existing and doing business under the laws of Idaho and is
2 | located in Aberdeen, Idaho.

3 |     75. Pleasant Valley Potato is an integrated potato producer that grows,
4 | packs, stores and ships its own potatoes.

5 |     76. Pleasant Valley Potato is a founding member of UPGI.

6 |     77. Defendant Raybould Brothers Farms LLC ("Raybould Brothers Farms")
7 | is a limited liability company under the laws of Idaho and is located in Rexburg,
8 | Idaho.

9 |     78. Raybould Brothers Farms grows and sells fresh potatoes.

10 |     79. Raybould Brothers Farms is a founding member of UPGI, and Jeff
11 | Raybould of Raybould Brothers Farms is an original incorporator of UPGA.

12 |     80. Defendant RD Offutt Co. ("RD Offutt") is a subsidiary of RDO
13 | Holdings Co., a corporation organized, existing and doing business under the laws
14 | of North Dakota with offices and its principal place of business located in Fargo,
15 | North Dakota.

16 |     81. RD Offutt has approximately 160,000 acres of farming operations across
17 | eight states, and is one of the nation's largest producers of potatoes, with
18 | approximately 60,000 acres devoted to potatoes.

19 |     82. RD Offutt, one of the world's largest potato growers, sent
20 | representatives to the initial meetings establishing the UPGI and participated in the
21 | group's price-fixing efforts.

22 |     83. In 2007, R.D. Offutt partnered with Defendant United II to create the
23 | joint venture North American Foods LLC (now known as Idahoan Foods, LLC),
24 | contributing potato processing plants in several states. This joint venture enabled
25 | potato growers to offload surplus potatoes and further reduce supplies and thereby
26 | further facilitated and contributed to the price-fixing scheme alleged.

27 | **IV. Non Grower Co-Conspirators**

28 |     84. Defendant Idahoan Foods, LLC (formerly known as North American

-12-

1 Foods, LLC, referred to as "Idahoan Foods") is a limited liability company
2 organized, existing and doing business under the laws of Delaware with offices and
3 its principal place of business located in Grand Forks, North Dakota.

4     85. North American Foods is a joint venture between Defendants RD Offutt,
5 a potato grower and processor, and United II, a co-operative of potato growers.
6 North American Foods manufactures mashed-potato products and dehydrated
7 products.

8     86. Wada Farms is one of the grower/owners involved in this joint venture
9 that supplies potatoes to Idahoan Foods.

10     87. North American Foods was formed "to create a broad network of potato
11 processing plants with convenient access to markets and to customers."

12     88. As one of the largest potato dehydrators in the country, North American
13 Foods enables its United II grower-owners to divert surplus potatoes to a
14 dehydration operation while profiting from vertical integration.

15     89.   Defendant Bayer CropScience LLC ("Bayer CropScience") is a
16 corporation organized, existing and doing business under the laws of North
17 Carolina with offices and its principal place of business located in North Carolina.

18     90. In 2008, Bayer CropScience became a "sponsor" of UPGA's United
19 Potato Partners program. That sponsorship continued in 2009 and 2010.

20     91. Bayer CropScience is the primary sponsor of UPGA's United Potato
21 Partners program, which is described on UPGA's website as supporting "the
22 underwriting of United's databases, administration and educational seminars. The
23 seminars provide a means for direct, two-way communication with potato
24 growers."

25     92. Bayer CropScience's participation in and funding of the United Potato
26 Partner Program, enables UPGA to "offset" the cost to growers of UPGA's data
27 gathering and price-fixing efforts. UPGA literature explains that this funding
28 partnership arises out of the "common objective" among UPGA, its growers, and

-13-

1  its corporate vendors: "The objective that a potato grower has in common with each
2  vendor is that each party wishes to survive and thrive in the potato business."

### AGENTS AND CO-CONSPIRATORS

4  93. The acts alleged in this complaint were authorized, ordered or done by
5  Defendant's officers, agents, employees, or representatives, while actively engaged
6  in the management and operation of Defendant's businesses or affairs.

7  94. Certain other persons, firms, corporations and entities have participated
8  as unnamed co-conspirators as defendants in the violations alleged in this
9  Complaint. In order to engage in the charged offenses and alleged violations, these
10 co-conspirators have performed acts and made statements in furtherance of the
11 antitrust violations and conspiracies alleged in this Complaint.

### CLASS ACTION ALLEGATIONS

13 95. Plaintiff brings this action on behalf of himself individually and on
14 behalf of the class, pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil
15 Procedure, which is defined as:

16              All persons and entities in the State of California who
17                 indirectly purchased fresh or process potatoes from
18              Defendants or their Co-Conspirators between June 18,
19                 2006 through the present. The class does not include:
20              (1) Defendants; (2) Defendant's parents, subsidiaries, or
21                 affiliates; (3) any co-conspirators; (4) any governmental
22                 entities; or (5) any judicial officer to whom this case is
23                                assigned.

24 96. Plaintiff does not know the exact number of class members because such
25 information is in Defendant's exclusive control. Plaintiff believes that, due to
26 the nature of the trade and commerce involved, there are likely at least tens of
27 thousands of class members in the state of California such that joinder of all class
28 members is impracticable.

-14-

1      97. Plaintiff's claims are typical of the claims of the class in that Plaintiff
2 purchased potatoes from Defendant, all class members were damaged by the same
3 wrongful conduct, and the relief sought is common to the class.

4      98. Numerous questions of law or fact arise from Defendant's
5 anticompetitive conduct that is common to the class. These common questions
6 include:

7 (a) whether Defendants and their co-conspirators engaged in or entered into a
8 contract, combination or conspiracy among themselves to fix, maintain, raise
9 and/or stabilize the prices of potatoes sold in the State of California;

10 (b) whether Defendants' unlawful conduct has enabled them to increase, raise,
11 maintain or stabilize above competitive levels the prices for potatoes sold in the
12 State of California;

13 (c) the duration of the contract, combination, or conspiracy alleged;

14 (d) whether the conduct of Defendants and their co-conspirators caused injury to
15 the business or property of Plaintiff and class members;

16 (e) the appropriate measure of damages sustained by Plaintiff and class members;

17 (f) whether injunctive relief is appropriate; and

18 (g) if injunctive relief is appropriate, what types of such relief are suitable in this
19 matter.

20 (h) whether Defendant's conduct violated California Business and Professions
21 Code, §§ 16700, *et seq.*;

22 (i) whether Defendant's conduct violated California Business and Professions
23 Code, §§ 17200, *et seq.*;

24 (j) whether Plaintiff and other class members were injured in their business or
25 property by reason of the unlawful conduct of Defendants, and the appropriate
26 measure of class-wide damages; and

27 (k) whether Plaintiff and class members are entitled to restitution.

28      99. These common questions of law or fact are common to the class and

-15-

1 predominate over any other questions affecting only individual class members.

2      100.  Plaintiff will fairly and adequately represent the interests of the class

3 in that he is a typical purchaser of potatoes from Defendants and/or Defendants'

4 Co-Conspirators and has no conflicts with any other member of the class.

5 Furthermore, Plaintiff has retained competent counsel experienced in antitrust and

6 California consumer class action litigation.

7      101.  A class action is superior to the alternatives, if any, for the fair and

8 efficient adjudication of this controversy.

9      102.  Prosecution of separate actions by individual class members would

10 create the risk of inconsistent or varying adjudications, establishing incompatible

11 standards of conduct for the Defendants.

12      103.  Plaintiff reserves the right to expand, modify, or alter the class

13 definition in response to information learned during discovery.

14                         **FACTUAL ALLEGATIONS**

15 **A. The Potato Industry**

16      104.  The United States potato industry is a multi-billion dollar annual

17 market. For example, in 2007 the United States potato market had a total

18 production of 449 million cwt (hundredweight or 100 pounds) of potatoes and the

19 value of production was $3.2 billion.

20      105.  In 2008, total domestic potato production was 415 million cwt,

21 approximately 7 percent below the 2007 crop levels (due to the supply reduction

22 price-fixing scheme alleged). Despite the reduced production, however, overall

23 market value of production was $3.49 billion, an increase of 13 percent over 2007

24 production values.

25      106.  Idaho and Washington are the two largest potato-producing states

26 (growing mostly "fall potatoes"), accounting for over half of United States

27 production. North Dakota, Colorado, Wisconsin, Oregon, Maine and Minnesota

28 accounted for another 30 percent of U.S. production, with 23 other states

1    accounting for the remaining 19 percent.

2         107.  California, Florida and Texas lead production of winter, spring, and

3    summer potatoes. These potatoes have a smaller share in the total potato market,

4    but satisfy specific needs for the fresh and process markets.

5         108.  Fresh potatoes are usually sold in the open market and processing

6    potatoes are typically sold through contracts. Processing potato contracts are

7    usually signed prior to the planting season and specify a potato variety, quantity

8    and base price with incentives based on quality requirements.

9         109.  The fresh and process potato markets are interconnected. According to

10   Defendants, one of the problems contributing to excess potato supply was process

11   growers planting acres of potatoes not under contract to sell on the open market.

12   Thus, it was crucial to fresh potato growers to get process potato growers to agree

13   to the price fixing conspiracy, as well. Defendants' price fixing scheme, as alleged,

14   was designed to and did fix, raise, maintain and/or stabilize prices for both fresh

15   potatoes and potatoes sold for processing.

16        110.  Potatoes can be readily stored and transported, making it possible to

17   market them to both the fresh and processed market. The fresh market generally

18   commands the highest price. Nearly two-thirds of potatoes were used for

19   processing in 2008, with frozen French fries and other frozen potato forms being

20   the largest segment. Table stock accounted for 28% of use and the remainder went

21   to feed, seed and other uses.

22        111.  Many fresh potato growers (such as several of the Defendants) are

23   vertically integrated and handle growing, packing, shipping, and even further

24   processing on the farm. Many of the large potato growers also act as packing and

25   shipping operations for other growers.

26        112.  Packing sheds generally work in conjunction with growers to wash,

27   grade and pack potatoes to be shipped to direct purchasers such as retailers and

28   distributors.

C:\Documents and Settings Potato Antitrust Litigation

113.  While potatoes were the single most-consumed vegetable in the United States in 2007, consumption in total pounds and as a percentage of total vegetables consumed have been declining since 2001. Average yearly potato consumption was 138.8 pounds in 2001, had declined to 126.0 pounds in 2007 and was forecasted to further decline to 125.3 pounds in 2008.

114.  The decline was true for both fresh potatoes and potatoes for processing, although the decline was greater for fresh potatoes. Fresh potato consumption declined almost 16% from 2001 to 2007 while potatoes for processing declined nearly 6% over the same time period.

115.  Despite declining demand, potato demand is highly price inelastic. A 1% decrease in fresh potato supply can cause up to a 7% increase in price due to a lack of suitable alternatives.

**B. The UPGA Cartel**

116.  In response to declining prices, Idaho potato growers (who produce approximately one-third of the potatoes in the United States) grew concerned about their profits in the early 2000s. In 2003, several Idaho growers agreed to implement acreage reductions in order to reduce supplies. Given the limited success of these schemes, however, one of the largest potato growers in the country, Defendant Albert Wada, formed an Idaho "cooperative" with other Idaho growers in order to formalize a joint agreement among his competitors to reduce potato supply and fix, raise, maintain and/or stabilize prices.

117.  Mr. Wada began realizing his expressed intent of "managing North American potato supply" by first seeking to organize Idaho potato growers. In late 2004, along with other Idaho potato growers, Mr. Wada co-founded United Fresh Potato Growers of Idaho ("UFPGI"), later renamed UPGI. Mr. Wada hoped UPGI would serve as a nucleus for an even larger, nationwide "cooperative" with member co-ops in each potato-producing state.

118.  Mr. Wada called his potato price-fixing plan, "United We Stand" and

-18-

1  openly discussed how he wanted to "unite" potato growers, "decrease competition"
2  and "rationalize the industry" by collectively curtailing production. UPGA's
3  website makes a similar point: "[i]n 2004, after evaluating the economic realities of
4  the current business climate, a group of potato growers decided that long-term
5  production and supply management are critically needed to provide stability and a
6  reasonable return for growers."

7      119. In published articles about this plan, Mr. Wada acknowledged that his
8  activities might be subject to antitrust laws. The attorney for UPGI and UPGA,
9  Randon Wilson, also discussed the fact that the Idaho cooperative (and later the
10 nationwide cooperative) would have to conform to the Capper-Volstead Act and
11 those packers and other ineligible businesses could not participate in the
12 cooperative
13 or their supply reduction schemes. Mr. Wilson is quoted in non-privileged, public
14 articles as saying that in order to receive protection under the Capper-Volstead Act,
15 "[w]e've got to be a pure farmer's cooperative" and packers and other ineligible
16 business could not be involved in the cooperative.

17     120. This advice was not followed. Numerous non-grower entities and
18 growers that also were packers were involved with Defendants' price fixing
19 scheme. For example, Wada Farms' own website notes: "Wada Farms is among the
20 largest growers **and packers** in the industry." (Emphasis added.) Thus, UPGI and
21 UPGA have no protection under the Capper-Volstead Act.

22     121. The potato cartel was first formalized when Mr. Wada organized a
23 meeting of Idaho potato farmers in September 2004 to discuss how to "curb
24 production" and "boost prices" for potatoes. At this meeting, Mr. Wada and Keith
25 Cornelison (of Defendant Cornelison Farms) summoned 23 Idaho potato growers
26 to an office in Blackfoot, Idaho, to discuss how their collective efforts at reducing
27 potato supplies would help fix, raise, maintain and stabilize prices.

28     122. After more meetings, phone calls and emails among these growers, the

group agreed to form UPGI - with the explicit goal of reducing potato supplies through various means.

123. The 23 growers in attendance at this meeting became the founders of UPGI, which filed for incorporation on November 2, 2004. The founders' operations encompassed approximately 60 percent of the fresh potatoes produced in Idaho and 25 percent of the fresh potato market in the United States.

124. The individuals at the initial UPGI meeting who explicitly signed on to the supply reduction and price-fixing scheme alleged included: Blaine Larsen (of Defendant Larsen Farms), Albert Wada (of Defendant Wada Farms), and Defendant Michael Cranney (of Cranney Farms) — the three largest growers in Idaho and among the biggest in the US. Other Idaho-based growers at this meeting who became founders of UPGI and signed on to the price-fixing and capacity reduction scheme, some of whom are named as Defendants, include Keith Cornelison (of Defendant Cornelison Farms), David Beesley (of Defendant Snake River Plains Potatoes), George Crapo (of Crapo Farms, Inc.), Mark Cummins (of Cummins Farms/Cummins Family Produce), Loraine Driscoll (of Defendant Driscoll Potatoes), Jeff Duffin (of Duffin Potato Company), Paul Duncan and Defendant Lance Funk (of Lance Funk Farms), Gary Hansen (of Hansen Farms), Dale Mickelson (of Defendant Rigby Produce), Ron Olsen (of Murdock Farms), Jeff Raybould (of Defendant Raybould Brothers Farms), Carl Taylor (of Howard Taylor & Sons), Kim Wahlen (of Defendant Pleasant Valley Potato), Blair Walker, Dick Watt (of Sun Spiced Grower Cooperative) , Lynn Wilcox (of Floyd Wilcox & Sons), Clint Young and Roy Young.

125. In the Articles of Incorporation of UPGI, the stated purpose of the organization is "to stabilize potato prices and supplies in the State of Idaho and to work with similar cooperatives in other states having similar purposes."

126. In October of 2004, the UPGI founders issued a press release discussing their goals of "supply management" principles and asked other potato

-20-

1 growers from around the country to attend another meeting to discuss the formation
2 of additional regional and national groups to assist in their price-fixing
3 efforts. The next cartel price-fixing meeting occurred on November 3, 2004, at
4 10:00 a.m. at the Shiloh Inn Convention Center in Idaho Falls, Idaho — the day
5 after UPGI's Articles of Incorporation were filed.

6     127.   Growers from Colorado, Oregon, Washington, Wisconsin and
7 California joined the Idaho potato farmers at the meeting. The meeting was closed
8 to the media. At the meeting, Mr. Wada announced the group's price-fixing plans
9 to several hundred potato farmers, which prompted a standing ovation. Many
10 farmers signed on to the supply reduction agreement on the spot agreeing to pay
11 annual dues ranging from about $10,000 to $500,000 depending on how much
12 acreage each farmer utilized for growing potatoes. Defendant RD Offutt Co., one of
13 the world's largest potato growers, sent a representative to this meeting and the
14 company subsequently agreed to the price-fixing scheme alleged, as well, and
15 participated in a joint venture to further aid the potato supply reduction efforts.

16     128.  On December 2, 2004, the 23 founding members of UPGI, all of whom
17 had signed on to the supply management scheme, voted to move the commitment
18 date to join the co-op to January 17, 2005 — two weeks ahead of the original
19 membership deadline. At this point, the group already had 80 percent of all acres
20 dedicated to fresh potatoes in Idaho committed to supply reductions under its
21 membership agreements. By February 2005, UPGI was colluding with owners of
22 91% of the fresh potato grower acreage in Idaho through various means.

23     129.  The fresh potato market is strongly affected by the processing potato
24 and seed potato markets as they are all interrelated. Cooperation with the process
25 and seed potato growers was crucial for UPGI's success. Thus, UPGI sought out
26 groups of process and seed growers to sign on its anticompetitive scheme.

27     130.  As of December 2004, UPGI had negotiated "Memorandums of
28 Understanding" ("MOU") with the directors of every potato grower group in

-21-

Idaho, including Potato Growers of Idaho ("PGI"), Potato Management Company ("PMC"), Seed Potato Growers of Idaho ("SPGI") and the Southern Idaho Potato Cooperative ("SIPCO"). SPGI and SIPCO later joined UPGI as independent districts.

131.   PGI was formed in 1968 to serve as a bargaining unit for growers in contract negotiations with potato processing companies. In the more than 30 years since its organization, PGI's mission has evolved to include representation of growers with governmental, legislative and industry organizations. In 2000, PGI membership opted to end its role as a contract negotiator, and to focus its efforts more fully on its information and representation missions.

132.   PMC was formed in 2000 by a group of Idaho potato growers and shippers to help reduce potato supplies. The group was successful in organizing various programs, including charitable donations and cattle feeding, that removed several million hundredweight of potatoes from the market. In addition, the group donated over 15 million pounds of potatoes to help reduce domestic supply.

133.   SIPCO was founded in 1997 and acts as the bargaining unit for Idaho frozen process growers. SIPCO also negotiates annual contracts with Idaho and Oregon processors with the goal of providing a stable and reasonable rate of return for the Idaho frozen process grower.

134.   SPGI was a group of seed potato growers. Seed potatoes are produced to be used for planting new crops of potatoes. Once cut into sets and planted, seed potatoes grow into table stock potato varieties. Seed potatoes themselves are not intended for human consumption.

135.   These groups were not "Capper-Volstead cooperatives," yet UPGI collaborated and conspired with them to reduce potato supplies. Through the cooperation insured by these MOUs, the growers, shippers and other entities working collectively with UPGI to reduce potato supplies accounted for more than 60 percent of *all* Idaho potato acres (and not just the vast majority of those devoted

-22-

1 solely to fresh potato production).

2     136. In December 2004, as part of these coordinated agreements, PGI (a
3 non-cooperative) issued a statement in its newsletter stating that "supply is
4 manageable but the key to making it so lies in a united and concerted effort to
5 manage supply." PGI re-emphasized that it is in the best interests of all growers to
6 unite in working out a plan to manage supply and spread the responsibility. PGI
7 and UPGI also issued joint newsletters espousing the need to collectively reduce
8 supply.

9     137. To achieve its supply reduction objectives, the UPGI developed and
10 started enforcing a set of programs and policies that targeted both production and
11 marketing of fresh potatoes. The level of potato production was controlled through
12 the implementation of two policies. First, before the beginning of a planting
13 season, the potato production was controlled by enforcing an acreage management
14 program, which was implemented through a bid buy down program. Secondly,
15 during the potato growing season, before harvest, the production was monitored
16 over time and accurate yield predictions were made; this was implemented through
17 a series of field digs.

18     138. The UPGI's marketing programs also included coordination of potato
19 shipments throughout a marketing year, providing marketing information to potato
20 growers and implementation of secondary market strategies. UPGI also sought to
21 remove excess potatoes by identifying new market opportunities such as donating
22 potatoes to charities.

23     139. UPGI initially studied and implemented many different methods to
24 reduce potato supply. UPGI's first supply control efforts involved using a price
25 floor by analyzing market information and setting floors for the main fresh pack
26 products. The price floors were eventually abandoned. UPGI also considered
27 making grade standards more stringent because diverting smaller potatoes into
28 processing would also reduce fresh potato supplies and boost market prices.

C:\Documents and Settings Potato Antitrust Litigation

COMPLAINT

1    140. A short time later, UPGI also employed another supply management

2 tool —"shipping holidays." The UPGI marketing committee would review market

3 information, including data from each member's packing operation. Each week

4 they would decide if a "shipping holiday" would be imposed. If a "shipping

5 holiday" was put in place, each potato packing operation would shut down for at

6 least one eight-hour shift in order to further reduce supplies and increase prices.

7    141. UPGI realized that its most effective method of controlling supply

8 would be to manage the production of the next year's potato crop through acreage

9 reductions.

10    142. UPGI's first year acreage management program was implemented in

11 spring 2005. The number of planted fresh potato acres for the fall 2005 crop was

12 reduced by approximately 15% (26,000 acres) relative to the 2004 year acreage

13 base against which the reduction was measured. The program proceeded in two

14 phases. First, a group of the largest potato growers reduced their planted area by

15 11,000 acres (15% on average). Secondly, the first ever bid buy-down program

16 was implemented. Potato growers were submitting bids on how much they needed

17 to be compensated in order not to plant, and UPGI accepted the best (*i.e.*, lowest)

18 bids, thus resulting in further acreage reductions.

19    143. UPGI also executed a secondary market strategy at the beginning of

20 2005 that removed approximately 8% of potato stock from the market. A surplus

21 from the 2004 fall crop was diverted to charities and food banks. For example, in

22 January 2005 UPGI donated 40,000 pounds of potatoes to food banks for the

23 expressly stated purpose of reducing potato supplies.

24    144. Furthermore, the first ever Idaho marketing conference calls were

25 implemented. The calls took place twice a week at the state level (and were later

26 established as once a week at the national level with the formation of UPGA). Prior

27 to a conference call, participating warehouses would log on the UPGI web page

28 and provide information on capacity, stocks and pack-outs. These data, along with

-24-

1 other information (prices, trends, weather, etc.), were discussed during the
2 conference call, and were summarized as a marketing summary posted on the
3 internet to assist with "flow control" and prevent potatoes from being shipped
4 when prices were too low.

5 145. With the understanding that these supply management techniques
6 would need to be undertaken on more than just a regional level, UPGI used UPGA
7 and the other co-conspirators to institute its supply-restriction techniques on a much
8 broader, nationwide scale. Mr. Wada and his co-conspirators nationalized
9 (and internationalized) their potato supply-restriction efforts and assisted in
10 forming other regional and national potato cooperatives with this goal in mind.

11 146. In December of 2004, UPGI met with growers in Colorado and
12 Wisconsin to aid in the formation of United Fresh Potato Grower groups in those
13 states as well. Oregon growers in Klamath Basin formed another group in that state
14 too. In February 2005, Washington growers also met to coordinate supply
15 restrictions. Regional potato grower cooperatives were later formed in Central
16 California, and other areas of the Southwest, Midwest and West. As UPGA's
17 website states, "Idaho leaders reach[ed] out to growers in other regions and
18 invite[d] them to form their own supply-management cooperatives as part of the
19 united effort. Soon, regional co-ops [were] formed in Colorado, Klamath basin (on
20 the border of California and Oregon), Washington-Oregon, and Wisconsin. (Later,
21 growers in central California, the Southwest, Midwest and West form[ed] co-ops.)"

22 147. These regional cooperatives then met to form a national group, under
23 the leadership of Albert Wada, which could coordinate the supply restrictions
24 across the United States and North America.

25 148. The original incorporators of UPGA include: Albert Wada (of
26 Defendant Wada Farms); Loraine Driscoll (of Defendant Driscoll Potatoes); and
27 Jeff Raybould (of Defendant Raybould Brothers Farms). The initial Board of
28 Directors was Tony Amstad (of Amstad Produce Inc. in Oregon); Warren Boegel

-25-

(of Boegel Farms in Kansas); Defendant Michael Cranney (of Cranney Farms in Idaho); Dennis Day (of Montana); Allen Floyd (of Harvest Fresh Produce in Washington); Tom Franconi (of Kern Produce Shippers in California); Dick Okray (of Okray Farms in Wisconsin); Ed Staunton (of Staunton Farms in California); Dave Warsh (of Warsh Farm in Colorado).

149.   According to the UPGA website,"[r]ealizing the need for national coordination, communication, data gathering and analysis, professional leadership and staff to handle the many facets and programs of the organization, United Potato Growers of America [was] formed" in March 2005. The national cooperative facilitated the nationwide supply-restriction campaign through its regional cooperative members (which were in turn made up of individual growers who implemented the actual supply reductions).

150. UPGA nationalized the regional supply-restriction scheme initially developed by UPGI. The UPGA's mission statement read: "[w]e bring order and stability to the North American potato growing industry and increase our member potato growers' economic potential by the effective use of cooperative principles."

151. UPGA's supply control efforts are further confirmed by the mission statements on its own website: "Vision: We will manage national potato supply so as to positively affect grower profitability."

152. In April of 2005, UPGA announced the first nationwide acreage buy down program in the history of United States potato production to its members. As with UPGI's acreage reduction efforts, grower members were allowed to "bid" acres into the buy-down program if they agreed to plant less acreage than they did in 2004. UPGA member funds would then be used to compensate those growers who agreed to plant less. Similar programs and acreage reductions have continued to present.

153. Regarding this acreage buy-down program, Albert Wada is quoted as saying: "This is a great opportunity to bring stability and rationale to our Potato

-26-

1  Industry… Through cooperation and unity we can and will help ourselves and each
2  other achieve our goals. We strongly encourage all growers to take advantage of
3  this offer while it is available and join their state or regional cooperative and the
4  United of America Board to reduce 2005 acres."

5  154.  In April 2005, Mr. Wada also traveled to Prince Edward Island in
6  Canada to facilitate the formation and operation of a North American-wide potato
7  cartel that would reduce potato supplies and fix potato prices across the continent.
8  The entire UPGA Board of Directors met with Canadian growers in Charlottetown,
9  Prince Edward Island, in June 2005. More than 250 growers attended this meeting,
10  preliminarily approved starting a Canadian counterpart to the UPGA, and voted to
11  cap island potato acreage for each grower. Because of this meeting and as
12  discussed further *infra*, Canadian growers formed the UPGC, which, as reflected in
13  the organization chart set forth previously, became a part of the UPGA.

14  155.  In June of 2005, UPGA announced that its first acreage buy-down
15  program had been a success. Members collectively agreed to cut their crop by tens
16  of thousands of acres to their lowest levels since 1959. Preliminary estimates
17  showed United States potato acreage down 35,000 acres as a direct result of the
18  UPGA's buy-down program.

19  156.  The impact of the UPGA program was also noted at the national level.
20  The average potato price was approximately 23 percent higher in 2005 relative to
21  2004. The United States Department of Agriculture ("USDA") noted that this was
22  due to the bid-buy program instituted by UPGA, which removed from the market
23  almost 11% of fresh potato production in 2005.

24  157.  UPGA's officers confirmed the success of their efforts. Jerry Wright,
25  the former CEO of UPGA, was quoted as saying that "due primarily to [UPGA's]
26  three-phase supply management program implemented nationwide, growers have
27  the highest returns ever for this time of the year.... The success of the whole
28  program is the result of the growers' determination to solve their own problems

-27-

1   and manage their supply."

2   158. On November 16-17, 2005, Idaho growers met to discuss 2006 crop
3   reduction guidelines at the Red Lion Inn in Pocatello, Idaho. Joint meetings were
4   also held with the SIPCO, U.S. Potato Board and the Potato Marketing Company.
5   At these meetings, UPGI members (including Defendant growers) and other Idaho
6   growers agreed to plant 10% less than their 2004 base acres.

7   159. UPGA's January 2006 newsletter announced the group's national 2006
8   crop reduction efforts following the Idaho growers' agreement to reduce plantings
9   by 10% from 2004 acres. Members not agreeing to reduce plantings by 10% were
10  required to pay a $50 per acre assessment. Those growers that agreed to reduce
11  acreage more than 10% were allowed to put their acres into the bid buy down
12  program for extra compensation.

13  160. UPGI and UPGA also coordinated potato flow control throughout the
14  marketing year in order to control the quantity of potatoes supplied to the market
15  throughout a marketing year when prices were low.

16  161. In Idaho, warehouses participating in the "flow control" program
17  represented more than 75% of Idaho's potato packing capacity. Personnel at
18  warehouses entered information on the capacity, stocks and pack-outs on the UPGI
19  webpage on a regular basis. After weekly telephone conversations, price advisory
20  information was then posted on the internet for members and non-members which
21  was then used as the pricing strategy for the coming week.

22  162. In a 2006 PowerPoint presentation prepared by Albert Wada for UPGA
23  members, titled "The North American Potato Cooperative Movement," Mr.
24  Wada detailed strong encouragement for members to stay committed to the supply
25  restriction efforts. Slides included the following:
26  • UNITED = GROWER PROFITABILITY - The
27  UNITED cooperative is gaining the grower critical mass
28  to be able to EFFECTIVELY manage supply in order to

-28-

1  attain fair pricing

2  • UNITED's System Will Work! - UNITED's programs

3  have helped to increase open market fresh table grower

4  returns for the '05 crop by multiple times '04 crop

5  pricing - Process grower markets are stronger - Econ.

6  101:  The only effective method for influencing price is to

7  manage the supply!

8  • The law of ECONOMICS will always win and growers

9  will lose if production and supplies are not managed

10  • UNITED'S STRATEGY? THE WHOLE PILE OF

11  POTATOES HAS TO BE MANAGED!

12  • Cooperative growers must create orderly markets and

13  grow the category…instead of fighting for a piece of it

14  by zero-sum competition!

15       163.   In published articles, Mr. Wada confirmed that the purpose of

16  UPGA was to reduce supply and raise prices:

17  [Wada] said the major benefit of the association is

18  communication. Sharing supply management data across

19  a broad growing region has allowed the organization to

20  raise prices by better matching potato supplies with

21  demand.  "We're talking to one another," Wada said. He described

22  the industry's oversupply and poor profitability as "an

23  albatross hanging around our necks for years."

24  **"Without supply management and grower solidarity,**

25  **we don't have adequate profit margins," Wada**

26  **added. "Growers tend to think it is a sin to produce a**

27  **profit. Potato growers are very independent and the**

28  **one thing that they can do is independently go broke."**

C:\Documents and Settings Potato Antitrust Litigation

COMPLAINT

1 **(Emphasis added.)**

2 164. In another interview, Albert Wada asserted that UPGA had "worked

3 with members to eliminate the potato glut by things like reducing the amount of

4 potatoes planted and pledging not to send potatoes to market in the event of

5 oversupply."

6 165. In addition to acreage buy-downs, UPGA also touted its "flow

7 control" efforts to keep potatoes from entering the market. Buzz Shahan, former

8 COO of UPGA, stated that "[y]ou can't enter all of those potatoes into the market

9 in one day. So we monitor the flow of product into the market on a weekly basis

10 and adjust the flow so that we don't create a periodic glut."

11 166. An August 2007 article in *High Country News,* titled "The Sultans of

12 Spuds - Battered by their own success, farmers form the 'OPEC of Potatoes,'"

13 described the meetings of UPGA and this "potato cartel" as follows:

14 Once a month, usually on a Wednesday morning, about a

15 dozen men arrive at the Salt Lake City airport on separate

16 flights from around the country. They are whisked into

17 waiting cars for the five-minute trip to a glass fronted

18 office building nearby. There, in an unpretentious

19 conference room, they meet several more of their

20 associates.

21 **These men are the leaders of a little-known**

22 **international cartel, and at meetings such as these,**

23 **they fine-tune an elaborate system of production**

24 **targets and quota transfers to control the price of the**

25 **commodity around which their world revolves.** It is a

26 serious business, backed up with reconnaissance from

27 satellites orbiting high above the Earth, and **the**

28 **organization's strict code of conduct allows for the**

C:\Documents and Settings Potato Antitrust Litigation
COMPLAINT

1  **use of what its members artfully refer to as "punitive**
2  **measures" against anyone who violates the rules.** And,
3  at lunchtime, the men always pause to sample their
4  merchandise. "We always serve potatoes. We always
5  serve potatoes, whether it's chips or fried or mashed or
6  whipped or salad," says Barb Shelley, one of a small
7  cadre of people who carry out the organization's
8  legwork. Not even lunch, it turns out, is safe from the
9  group's intense scrutiny: "When we order from the
10 caterer, we say, 'These are potato growers. We want your
11 highest quality potatoes. Do not'" - Shelley pauses
12 ominously - "'give us bad quality.'"
13 This may sound like a plot lifted straight out of a Mel
14 Brooks movie, **but the potato cartel is real**. And its
15 existence speaks volumes about the often-perverse
16 dynamics of American agriculture. (Emphasis added.)

17     167.  Mr. Shahan was also quoted in this article as stating that the UPGA's
18 members "are very strong guys that have been kicking people's butts since junior
19 high" and that "to get them in a room and have them discuss market share and
20 things like that, it gets a little Western."

21     168.  An article in *The Wall Street Journal* titled "This spud's not for you:
22 Co-op of farmers seeks to become OPEC of potatoes" also compared the
23 Defendants' potato supply control conspiracy to that of OPEC: "[i]t took farmer
24 Merrill Hanny three days to bury $100,000 worth of his perfectly good potatoes.
25 He remembers how they crunched beneath his tractor as he plowed over his muddy
26 field in the spring of last year. Mr. Hanny destroyed part of his crop at the behest
27 of the United Potato Growers of America, a fledgling group of regional farming
28 cooperatives. The group aspires to be to potatoes what OPEC is to oil by carefully

-31-

managing supply to keep demand high and constant, resulting in a more stable return for farmers."

169. In order to ensure strict compliance with the supply reduction and price-fixing agreement, UPGI and UPGA conducted audits and utilized GPS, aerial photography and satellite imaging to verify that co-conspirators had complied with the quotas and not exceeded the potato acreage upon which they agreed to grow.

170. At the beginning of the planting season, growers filled out the Planting Intention Form. On this form, the growers recorded their 2004 year base acreage and their current year planting intentions by potato variety. The Planting Intention Form was then the grower's commitment against which the grower's actual performance was evaluated.

171. UPGA also checked farmers' acreage against the paperwork they submitted to the federal Farm Service Agency for government-support programs. The documents used to assess the actual acreage grown were the copies of the Farm Service Agency ("FSA") Form 578 (*i.e.*, a report of acreage). Growers had to agree to allow UPGA access to these otherwise confidential submissions.

172. The UPGI's and UPGA's field representatives would review the grower's planting intention commitment, filed maps and FSA Form 578. Then, the representative would conduct inspections of each parcel of land to verify actual plantings and reductions. The results of the audit were then reported to the Future Crop Committee and the UPGI and UPGA Boards.

173. In 2006, the fields of 25% of the general membership and of 100% of the UPGI Board members were audited, which represented 65% of the UPGI's fresh potato acres. At that audit, all the audited fields were in compliance with supply reduction scheme and bid buy-down programs. The audit confirmed that the audited members of the UPGI reduced the potato acreage by more than 10% relative to the 2004 year base.

174. Any growers that did "cheat" were subject to punitive measures and

1   fines. For example, the cooperatives' bylaws allowed them to levy fines of $100
2   per acre against growers who violated the supply reductions.

3       175.  UPGA argued in its newsletter that its acreage buy-out and reduction
4   program would lead to significant financial returns for growers: "[w]ithout the
5   Acreage Buy-Out program, growers very likely will be looking at GRI's next year
6   that will be $3 to $4 per cwt. lower versus 2005. Please do not forget the lessons of
7   the last few bad years caused by overproduction. With your $50 per acre 'Payment-
8   in-Kind' investment in the acreage reduction plan, we anticipate 2006 GRI's
9   greater than 2005. Per acre, that is more than a 3000% ROI.  It is not a gamble; IT
10  IS SMART BUSINESS AND RISK-MANAGEMENT!!"

11      176.  UPGA was correct; the potato cartel's efforts began to see significant
12  progress in raising prices starting in 2005 (and continuing to present) as the cartel
13  was able to reduce potato supply. Between September of 2005 and June of 2006,
14  potato growers received an average of $6.67 for every 100 pounds of potatoes – a
15  nearly $4 increase from the previous year. By 2007, farmers were averaging $7.75
16  for every 100 pounds of potatoes.

17      177.  According to a *Spudman* reader survey in May of 2006 – cited in
18  then-UPGA CEO Julia Cissel's 2006 PowerPoint presentation titled "Managing
19  Supply and Influencing Acreage" – "85% of all respondents said they have seen an
20  increase in their profits since UPGA was formed."

21      178.  UPGA's and UPGI's potato acreage reductions and subsequent price
22  increases carried on into 2007, 2008 and to the present.

23      179.  UPGA and UPGI's 2007-08 United Acreage Reduction Program
24  established the following rules similar to those of the earlier years: Each base
25  potato acre was assessed at $50. A base year relative to which the acreage
26  reduction was calculated was 2004. Members and *non-members* willing to
27  participate in the program had two options. The first option was to reduce potato
28  planting area by exactly 15% relative to the 2004 year base. This option was

considered to be a payment in kind and the grower would owe no cash. The second option was to reduce potato acreage by less than 15% relative to the 2004 year base. In this case, the grower was assessed a pro-rated percentage of $50 per acre on all base acres.

180.   There were four levels of the pro-rated percentage. For example, if a grower's acreage reduction was between 10% and 14.99%, then the grower paid $20 per base acre; if the acreage reduction was between 5% and 9.99%, then the grower paid $30 per base acre. The collected money was used to "buy out" acres elsewhere. Growers who decided to expand beyond their base were assessed $100 per acre on all acres (expansion plus base acres). This fee was a punitive measure to prevent the "mindless expansion" that UPGI and UPGA considered illegitimate and against the mission of supply reduction.

181.   Those SIPCO members of UPGI who grew only processing potatoes were allowed to plant only contracted processing potato acres. The UPGI/SIPCO members who grew both fresh and processing potatoes were required to follow the potato planting guidelines for their fresh potato acres and were allowed to plant only contracted processing potato acres.

182.   All UPGA and UPGI members (and some non-members) agreed to these programs and reduced supply as a result, or paid assessments to allow others to reduce supply.

183.   In 2008, growers following UPGA's plans planted on 80,000 fewer acres than in 2007. In Idaho alone, growers reduced acreage from 350,000 to 300,000. In an interview about why farmers were cutting acres, UPGI's CEO, Jerry Wright, stated: "[y]ou have the combination of growers having alternative cash crops and they know they have to reduce potato planting to get supply in balance with demand. This is the year they've been able to do it."

184.   Because of these efforts, by the summer of 2008, according to the Idaho Potato Commission, a ten pound bag of potatoes cost consumers $15 — up

-34-

$6 over 2007. A 2008 study by an Agricultural Economics Professor at the University of Idaho confirmed that UPGI's and UPGA's efforts had led to increased prices. The study found that the Idaho monthly fresh potato prices increased from $3.89 per cwt in the pre-cooperative period to $6.63 per cwt in the co-op period, while the US monthly fresh potato prices increased from $7 per cwt. to $10.19 per cwt. The study found that approximately 60% of the price increases were due to reasons other than increased production costs and that the cooperatives' price-fixing efforts were "likely to be the most significant factor explaining the identified price increases."

185. The study found that "[a]s indicated by the US monthly fresh potato prices, all potato growers received higher prices since 2005, after the acreage management programs started being implemented in several potato growing regions in the country." Furthermore, the authors concluded, "we believe that the [UPGI] and potato growers' cooperatives with similar objectives were successful in accomplishing their goals and impacted the fresh potato price level and volatility during the period of 2005-2008, which ultimately benefited all potato growers."

186. In an article in the December 15, 2008, issue of *Packer Online*, Paul Dolan, General Manager of Associated Potato Growers, Inc., noted that demand was down from 2007 because potato prices were 50% higher than the previous year, a situation he attributed in part to "market unity."

187. By 2009, potato prices had remained constant or grown for four consecutive growing seasons -- something that had never happened in more than a century that USDA has been keeping such records.

188. On its previous website FAQs, UPGA stated that there was "no doubt" that its numerous efforts to reduce supply had impacted and improved potato prices: "Q. How can you prove that UPGA's efforts to manage supply influenced last year's price? A. While many factors influence supply, there is no doubt that UPGA's acreage reduction, acre buy-down, flow-control, and

1    information sharing programs impacted the market."

2    189. UPGA's annual report also discussed how its anticompetitive scheme
3    affected prices for process potatoes: "[b]efore United [UPGA] was formed nearly
4    all of the process contracts were tonnage-based. As a result, process growers
5    overplanted to avoid penalties associated with not delivering enough potatoes to
6    meet their contract. The Potato Marketing Association of North America and
7    processors began to switch the contracts from tonnage-based to acreage-based
8    contracts. Acreage-based contracts minimized the uncertainty for the process
9    grower and frozen processor while also reducing excessive flow of potatoes from
10   the process sector to the fresh sector. Graph #3 reveals the frozen processing usage
11   volumes versus out of field contract prices in Washington. [UPGA] has a data
12   sharing agreement with PMANA [the Potato Marketing Association of North
13   America] to improve the profitability of process growers."

14   190. Thus, Defendants and their co-conspirators' acreage restrictions,
15   acreage buy-downs, and flow control measures caused potato prices to be fixed,
16   raised, maintained and/or stabilized.

17   191. Defendants' anticompetitive scheme has continued to the present. For
18   example, a May 2010 UPGA newsletter describes how 400 fresh and process
19   potato growers in the United States attended 16 United Potato Partners seminars
20   this year at which they "consider[ed] the latest about cost of production specific to
21   their area, ponder[ed] current demand data and review[ed] United's published
22   acreage guidelines before beginning spring planting." The seminars were designed
23   to facilitate "informal discussions." As Mr. Shahan was quoted as saying, "[t]hese
24   seminars are one of the most important methods we have for communicating
25   United's published acreage planting guidelines to member and non-member
26   growers in a face-to-face setting." At each of these seminars, a representative of
27   Defendant Bayer CropScience was also present.

28   192. Similarly, on its website, UPGI has a page devoted to its 2010

-36-

Planting Guidelines, which were issued in September 2009. UPGI has the following to say about planting:

> Harvest is in full swing, and many are establishing plans for next year's potato crop. By now, all of you already know the top line on this year's crop. Across the state, it appears we are experiencing higher yields. If this continues, we could have as much as 5% more potatoes statewide than expected. The same thing is happening in Wisconsin and Colorado. They, too, are experiencing higher yields. Your markets are already telling you what to expect. The GRI on Norkotahs today is $4.66 and on Burbanks it is $5.52. Realistically, given the likely size of this year's crop, we could easily see a larger than normal carry over into next year.
>
> **With this potential in mind, United of Idaho's Supply Committee is in agreement with ALL of the United of America Directors in recommending the follow planting guidelines for next year. All growers are asked to plant 70-75% of their 2004 base in 2010 to BALANCE next year's crop with this year's anticipated large carry over.** This recommendation to cut 25–30% off your 2004 base acres will be finalized in November when we have the final tally on this year's yields and production nationwide. This same 70-75% planting guideline is extended to all fry contract growers.
>
> (Emphasis added.)

193. All Defendants involved in potato growing and selling operations (including Wada Farms and Wada Farms Marketing Group (on behalf of

1   themselves and Dole Foods); Potandon (on behalf of itself and General Mills);
2   Blaine Larsen Farms; Michael Cranney doing business as Cranney Farms;
3   Cornelison Farms; Snake River Plains Potatoes; Driscoll Potatoes; Lance Funk
4   doing business as Lance Funk Farms; Rigby Produce; Pleasant Valley
5   Potato; Raybould Brothers Farms; and RD Offutt) were direct participants in the
6   supply reduction scheme outlined and followed acreage reductions, participated in
7   the bid-buy-down program, participated in and utilized information obtained from
8   marketing calls and packing reports and/or reduced the domestic supply of potatoes
9   for the express purposes of fixing, raising, maintaining and/or stabilizing prices.

10      194.  While certain aspects of UPGA's schemes have been publicly
11   discussed, all attendees to UPGA Board of Directors and Committee meeting
12   attendees must have signed a "United Confidentiality Agreement" each year and
13   promised not to disclose information shared at these meetings.

14      195.  Any violation of that agreement allows UPGA to exclude such person
15   from future meetings or to sue such a person in a court of law to halt disclosure and
16   for damages experienced by UPGA as a result of any such disclosure.

17              **DEFENDANTS ARE NOT ENTITLED TO PROTECTION OF**
18                        **THE CAPPER-VOLSTEAD ACT**

19      196.  The Capper-Volstead Act provides an exemption from antitrust law
20   for certain associations and cooperatives comprising agricultural producers that
21   meet specific criteria. The Act protects an association and its members from
22   antitrust scrutiny, provided that: (1) the association is operated for the mutual
23   benefit of its members; (2) no member of the association is allowed more than one
24   vote because of the amount of stock or membership capital he may own therein, or
25   that the association does not pay dividends on stock or membership capital in
26   excess of 8 per centum per annum; and (3) the association does not deal in the
27   products of nonmembers to an amount greater in value than such as are handled by
28   it for members. The antitrust immunity provided by the Capper-Volstead Act is

-38-

1    "limited" and does not exempt all cooperative conduct from review.

2    197. The Capper-Volstead Act only protects "persons engaged in the

3 production of agricultural products as farmers, planters, ranchmen, dairymen, nut

4 or fruit growers." This phrase does not extend to a processor of agricultural

5 products or any person or entity not engaged in farming, planting, ranching, and

6 growing. Capper-Volstead Act immunity will not protect an association or any of

7 its members if even one member fails to qualify as a "person[] engaged in the

8 production of agricultural products."

9    198. In a 1985 publication titled "Understanding Capper-Volstead,"

10 reprinted in 1995, the USDA stated that "if an association of producers . . . restricts

11 members' agricultural output . . . [or] colludes with third parties to fix prices . . .

12 [or] conspires with third parties to fix prices . . . [or] combines with other firms to

13 substantially lessen competition . . . " then "it may find itself just as subject to

14 prosecution for being in violation of the antitrust laws as would any other firm that

15 engages in such practices."

16    199. UPGI, UPGA and their co-conspirators have touted their purported

17 immunity from suit under the Capper-Volstead Act and have prominently featured

18 the advice of their antitrust lawyer (Randon Wilson of the Jones Waldo law firm)

19 in publicly available, non-privileged documents as cover for their admitted supply

20 restriction efforts and conspiracy to fix, raise, maintain and/or stabilize prices.

21    200. UPGA and its co-conspirators' efforts at reducing potato supply prices

22 fall outside the legitimate activities of the Capper-Volstead Act. UPGA, UPGI and

23 their co-conspirators have engaged in all of the activities discussed above, as well

24 as others, which have negated their ability to claim immunity from antitrust laws

25 under the Capper-Volstead Act.

26    201. UPGA, UPGI and their co-conspirators are not entitled to the limited

27 protections found in the Capper-Volstead Act for at least the following reasons:

28 (a) UPGA and its members (including UPGI and the other member

1   cooperatives) are not legitimate cooperatives and they do not

2   market, process or sell potatoes—they are instead trade groups

3   designed to serve as forums for a nationwide (and continent wide)

4   agricultural supply-restriction agreement among

5   competitors. Their efforts have improperly and unduly enhanced

6   prices;

7   (b)UPGA and its members are made up of vertically integrated

8   producers that are also packers and shippers in violation of the

9   Capper-Volstead Act;

10   (c) UPGA and its members implement predatory conduct and

11   impose coercive, punitive and retaliatory measures against

12   members that do not comport with the supply reduction

13   conspiracy;

14   (d) UPGA, its members, and co-conspirators have conspired and

15   colluded with third parties to reduce supply and fix prices;

16   (e) UPGA, its members, and co-conspirators have conspired and

17   colluded with non-member potato farmers to reduce supply and

18   fix prices;

19   (f) UPGA, its members, and co-conspirators have conspired and

20   colluded with foreign entities, including the United Potato

21   Growers of Canada and Potato Marketing Association of North

22   America, in an attempt to reduce supply and fix prices for the

23   North American continent;

24   (g) UPGA, its members, and co-conspirators have conspired and

25   colluded with non-member "partners" who are not engaged in

26   agricultural production and who have funded potato supply

27   control efforts; and

28   (h) UPGI, its members, and co-conspirators have conspired and

C:\Documents and Settings Potato Antitrust Litigation

COMPLAINT

1  colluded with "United II" — a non-grower, vertically integrated

2  potato purchaser, to assist with supply-restriction efforts.

3  202. UPGA-member cooperatives are made up of direct competitors rather

4  than small farmers banding together to cut out the corporate middlemen who

5  would otherwise market their potatoes. These cooperative members do not

6  associate to collectively process, handle and market their products, and UPGA

7  does not provide those services.

8  203. UPGA does not wash, grade, package, store, transport or distribute its

9  members' potatoes. UPGA does not negotiate contracts of sale for its members.

10  UPGA does not "market" its members' products. Rather, as set forth in its

11  promotional materials, publications, website and numerous public statements,

12  UPGA was founded for the express purpose of implementing a scheme to manage

13  and restrict the supply of potatoes.

14  204. Mr. Wilson, UPGA's attorney, publicly discussed that shippers and

15  packers could not be affiliated with any Capper-Volstead Act potato cooperatives.

16  205. The Capper-Volstead Act does not protect fully integrated producers

17  that also grow, pack, process, store and ship potatoes.

18  206. Many of the founders of UPGI and UPGA, as well as numerous others

19  co-conspirators, are integrated operators (called grower-shippers) that grow, pack,

20  process, store and ship their own and other growers' potatoes.

21  207. For example, Defendant Wada Farms operates a 140,000 square foot

22  packing facility in Pingree, Idaho. Wada also operates a 35,000 square foot

23  Blackfoot, Idaho, facility with partner Van Orden Enterprise.

24  208. Idaho grower-shippers involved in the conspiracy alleged (some of

25  whom are named as Defendants herein) include, among others: Wada Farms;

26  Larsen Farms; Cummins Family Produce, Inc.; Driscoll Potatoes; Floyd Wilcox &

27  Sons, Inc.; Howard Taylor & Sons, Inc.; Pleasant Valley Potato; Rigby Produce;

28  and Snake River Plains Potatoes.

-41-

1      209.  UPGA and its regional co-operative members routinely coerced and
2   conspired with non-members in seeking to reduce potato supply and explicitly
3   recognized the importance of having non-members follow their planting reductions
4   and other supply-restriction efforts.

5      210.  In a publicly disclosed interview on UPGA's website, not subject to
6   attorney client privilege, UPGA's attorney Randon Wilson stated, "cooperatives
7   wishing to benefit from the limited antitrust protection afforded by the Capper-
8   Volstead Act must make sure that they do not enter into agreements with
9   nonmembers to fix prices of limit supplies. They cannot be predatory or unduly
10   enhance prices." This advice was not followed.

11      211.  UPGA and UPGI specifically sought out and allowed non-members to
12   participate in their acreage reduction programs.

13      212.  Non-members were not only invited to participate in the price fixing
14   scheme alleged, but they actively participated at UPGA's direction and request.

15      213.  The Capper-Volstead Act does not protect non-United States farmers
16   or cooperatives, nor does the Act protect domestic cooperatives that conspire with
17   non-protected entities, such as foreign producers, to reduce global agricultural
18   supply.

19      214.  In implementing the output restriction scheme UPGA has conspired
20   with a Canadian potato association and a North American growers association
21   made up of many Canadian growers.

22      215.  UPGA and UGPC are admittedly jointly managing North American
23   potato supply.

24      216.  The UPGA and UPGC have an interest in preventing lower-priced
25   imports from each other's members. By jointly agreeing on supply restrictions,
26   each can limit or minimize the deleterious effects of low-priced imports flooding
27   their market.

28      217.  UPGA has "partnered" with non-agricultural producing companies

-42-

1  that explicitly conspire with UPGA and assist in its efforts to reduce potato supply

2  so that the companies can have access to UPGA members to sell their products.

3      218.  UPGA's website discusses this "United Partners Program" as a

4  "strategic alliance" by which partner companies help offset UPGA's costs in

5  implementing its supply-restriction scheme:

6              Q: What is the United Potato Partners Program?

7              A: The United Potato Partners Program has three

8          objectives: 1. Maximize the price the potato producer

9          receives for his annual crop. 2. Minimize the cost of

10          gathering the market data that allows the producer to

11          maximize price. 3. Provide manufacturers of crop-input

12             products a direct link to their grower-users.

13          The market intelligence supplied by United's database

14          matches supply to demand such that grower returns

15          remain positive and stable. Financially healthy growers

16          can afford healthy budgets. **There is a cost to acquiring,**

17          **analyzing, and implementing the data relating to**

18          **potato markets. Until now, these costs have been**

19          **borne by United's growers. Corporations that supply**

20          **potato growers with everything from potato handling**

21          **equipment, to tractors, to field chemicals and**

22          **fertilizers, irrigation equipment, and packing and**

23          **packaging equipment can now, through a carefully**

24          **structured program, offset the cost of the database**

25          **nationally and regionally.** (Emphasis added.)

26      219.  As part of this transaction, UPGI formed United II, a second co-op

27  based in Idaho Falls, Idaho. All UPGI members were able to join the new co-op

28  (and had to join to be able to sell potatoes to the venture). With RD Offutt Co.,

-43-

United II next formed a joint venture, North American Foods, LLC. This joint venture purchased Idaho Fresh-Pak, Inc. ("IFP") — the country's third-largest potato dehydration company. The purchase included IFP's four Idaho plants and the "Idahoan" brand names. RDO contributed its three dehydration plants situated in North Dakota, Nevada, and Idaho along with its production agreement with Idaho Supreme Potatoes, Inc. Under a formula-based pricing arrangement, United II growers supply all the potatoes for the Idaho and Nevada plants.

220.  United II potato growers have ownership of the new company, receive dividends, and have a guaranteed market for their dehydrator-grade potatoes.

221.  In December 2007, UPGI announced the new "Idahoan Fresh Potato Plan" as part of this venture and as a means to further control supplies and fix prices where UPGI proposed that growers sell 100% of their potatoes to Idahoan Fresh.

## ANTICOMPETITIVE EFFECTS OF DEFENDANT'S CONDUCT

222.  The above aggressive anticompetitive practices and illegal exclusionary conduct has had the following effects, among others:

(a) Price competition among the Defendants and their coconspirators in the sale of potatoes was restrained and suppressed;

(b) Prices of potatoes manufactured and sold in the United States by the Defendants and their co-conspirators were fixed, raised, maintained and/or stabilized at supracompetitively higher, noncompetitive levels; and

(c) Indirect purchasers of potatoes, including Plaintiff and class members, were deprived of the benefits of free and open competition in the purchase of potatoes.

223.  Defendants' contract, combination and conspiracy described consists of a continuing agreement, understanding and concert of action among the

-44-

Defendants and their co-conspirators, the substantial terms of which were to artificially fix, raise, maintain and/or stabilize prices paid by Plaintiff and class members for the indirect purchase of potatoes in the United States, its territories and possessions.

224.  In formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators did those things that they unlawfully combined and conspired to do, including, among other things: agreeing to artificially fix, raise, maintain and/or stabilize prices for potatoes in California; and implementing and monitoring the conspiracy among cartel members.

225.  There are no legitimate pro-competitive efficiencies that justify Defendant's conduct or outweigh its substantial anticompetitive effects.

## INJURY TO PLAINTIFF AND CLASS MEMBERS

226.  The activities described above have been engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful agreement to fix, raise, maintain and/or stabilize the prices for potatoes sold in the United States.

227.  As a direct and proximate result of the contract, combination and conspiracy alleged, Plaintiff and other class members were, and continue to be, damaged in their business or property in that they paid supracompetitive prices for potatoes products during the class period, higher than that which they would have paid in the absence of the contract, combination and conspiracy.

## FIRST CAUSE OF ACTION

## FOR VIOLATIONS OF THE CARTWRIGHT ACT

## (CALIFORNIA BUSINESS AND PROFESSIONS CODE §§16720, ET SEQ.)

228.  Plaintiff realleges and incorporates by reference each of the foregoing paragraphs, and further alleges as follows.

229.  Plaintiff and class members are "persons" within the meaning of the Cartwright Act, as defined in §16702.

230.  Defendants and their co-conspirators have engaged in illegal, unfair

-45-

1 and deceptive trade practices, including, but not limited to, entering into exclusive
2 dealing arrangements in an unreasonable restraint of trade in violation of the
3 California Cartwright Act, Business and Professions Code §16720.

4     231. Defendants and their co-conspirators knowingly and willingly
5 engaged in a course of conduct designed o establish a fraudulently obtained
6 monopoly and agreed and conspired to extend that monopoly power in violation of
7 California Business and Professions Code § 16726.

8     232. The illegal, unfair or deceptive trade practices alleged in this
9 Complaint have prevented or suppressed competition, and resulted in the prices for
10 potatoes to be illegally inflated. The illegal, unfair or deceptive trade practices
11 alleged in this Complaint violate the California Cartwright Act, Business and
12 Professions Code Section 16720, *et seq.*, and are at a minimum an unreasonable
13 and unlawful restraint of trade.

14     233. As a direct and proximate result of Defendants' contracts to restrain
15 trade and monopolize the relevant market, Plaintiff and the class have suffered
16 injury to their property and have been deprived of the benefits of free and fair
17 competition on the merits.

18     234. Because of Defendants' unlawful conduct, Plaintiff has sustained
19 damages by paying supra-competitive prices that would not have been incurred but
20 for Defendant's unlawful conduct as alleged in this Complaint, and is entitled to
21 recover from Defendants the full consideration paid for potatoes, treble damages
22 and equitable relief, under the California Cartwright Act, Business and Professions
23 Code §§ 16750(a) and 16761.

24 **SECOND CAUSE OF ACTION**

25 **FOR VIOLATIONS OF THE UNFAIR COMPETITION ACT**

26 **(CALIFORNIA BUSINESS AND PROFESSIONS CODE §§17200, ET SEQ.)**

27     235. Plaintiff realleges and incorporates by reference each of the foregoing
28 paragraphs, and further alleges as follows.

1    236. The aforementioned conduct by Defendants and their co-conspirators
2 was intended to constitute unfair competition and unlawful business practices that
3 are forbidden by law within the meaning of California Business and Professions
4 Code §§17200, *et seq*.

5    237. The acts or practices described above are in violation of California
6 Business and Professions Code §§16720, *et seq*., and are otherwise unfair,
7 unconscionable, unlawful or fraudulent and in violation of the laws of the State of
8 California.

9    238. Because of these violations of California Business and Professions
10 Code §§ 17200, *et seq*., Defendants and their co-conspirators have unjustly
11 enriched themselves at the expense of Plaintiff and the class members.

12    239. Defendants and their co-conspirators should be required, pursuant to
13 California Business and Professions Code Sections 17202-04, to disgorge their
14 illegal gains for the purpose of making full restitution to all injured class members
15 as identified above. Defendants and their co-conspirators should also be
16 permanently enjoined from any continuing violations of California Business and
17 Professions Code Section 17200, *et seq*.

18 ## THIRD CAUSE OF ACTION
19 ## FOR UNJUST ENRICHMENT

20    240. Plaintiff realleges and incorporates by reference each of the foregoing
21 paragraphs, and further alleges as follows.

22    241. Defendants have benefited from unlawful acts through the
23 overpayments and increased profits for potatoes paid for by Plaintiff and the class.

24    242. It would be inequitable for Defendants to retain the benefits resulting
25 from these overpayments, which were conferred by Plaintiff and the class.

26    243. Plaintiff and the class are entitled to the establishment of a
27 constructive trust consisting of the benefit to Defendants of such overpayments,
28 from which Plaintiff and the class may make claims on a pro-rata basis for

-47-

1  restitution.

2  ## FOURTH CAUSE OF ACTION

3  ## FOR COMMON LAW MONOPOLIZATION

4  244.  Plaintiff realleges and incorporates by reference each of the foregoing

5  paragraphs, and further alleges as follows.

6  245.  Defendants and co-conspirators have engaged in predatory and

7  anticompetitive conduct to intentionally obtain and maintain their monopoly power

8  in the relevant market in violation of common law.

9  246.  Defendants willfully acquired their monopoly and maintained it by

10  suppressing the competition in potatoes through restrictive and exclusionary

11  conduct.

12  247.  Plaintiff and the class suffered injury in their business and property as

13  a result of Defendants' monopoly power and anticompetitive conduct.

14  ## DAMAGES

15  248.   During  the  class  period,  Plaintiff  and  the  other  class  members

16  purchased potatoes from Defendants, or their subsidiaries, agents, affiliates and/or

17  co-conspirators, and by reason of the antitrust violations alleged in this Complaint,

18  paid more for such items than they would have paid in the absence of such antitrust

19  violations. As a result, Plaintiff and the other class member share sustained

20  damages to their business and property in an amount to be determined at trial.

21  ## PRAYER FOR RELIEF

22  WHEREFORE, Plaintiff prays that:

23  A.  This action may properly be maintained as a class action under Rule 23

24  of  the  Federal  Rules  of  Civil  Procedure,  and  certifying  Plaintiff  as  the  class

25  representative and designating his counsel as counsel for the class;

26  B.  Plaintiff and the class be awarded treble damages as a result of

27  Defendants' conduct alleged in this complaint, as provided by California Business

28  and Professions Code §16750(a);

C:\Documents and Settings Potato Antitrust Litigation
COMPLAINT

1

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

2

3   trial as to all issues so triable.

4   Date:  August 30, 2010                    Respectfully submitted,

5

6                                      By: _____
7                                             REGINALD TERRELL

8                                             DONALD AMAMGBO
                                              AMAMGBO & ASSOCIATES
9                                             P. O BOX 13315, PMB # 148
                                              OAKLAND, CA 94661
10                                            510 615 6000/FAX: 510 615 6025

11
                                              REGINALD TERRELL
12                                            THE TERRELL LAW GROUP
                                              P. O BOX 13315, PMB # 148
13                                            OAKLAND, CA 94661
                                              510 237 9700/FAX: 510 237 4616
14

15                                            SHARRON WILLIAMS GELOBTER
                                              ATTORNEY AT LAW
16                                            1736 FRANKLIN STREET, 10TH FLOOR
                                              OAKLAND, CA 94612
17

18

19

20

21

22

23

24

25

26

27

28

-49-

C:\Documents and Settings Potato Antitrust Litigation
COMPLAINT